Chief Justice Robertson,
delivered the opinion of the court.
Shortly after the judgment was rendered int favor of Sneed, in the action of detinue, just decided by this court, Ewing and wife filed a bill in chancery, asserting their right to the same slaves, and to a tract of land in Shelby county, in this state. They allege, that, by a paper, purporting to he the will 6f Robert K. Moore, dated in April, 1806, and proved in Indiana, in 1807, the slave Agnes, and the tract of land in Shelby, were devised to Sneed, and the residue of said Moore’s estate, was devised to said Sneed and Thomas Prather, in trust for Catharine Moore, the wife of the- testator; that the, will was executed when the testator had no child; but, that after its date, Sarah Loyd Moore, the issue of the marriage, was horn, and that she and her co-complainant, intermarried in 1823; that, she was the only child- of Robert *461 K. Moore, and was not mentioned in the will. They, therefore, make Sneed and Catharine Moore defendants, and pray for a decree setting aside the will, for general relief.
Mrs. Moore having failed to answer, the bill was taken for confessed against her.
Sneed, in his answer, insists on the validity of the will, and denies that there was any revocation of it, express or implied; alleging, that the complainant. Sarah, was not the legitimate child of Roben K. Moore: because her mother was the wife of John Prince, who was still living.
It appears from the depositions filed in the case, that Robert K. Moore1, was a resident and citizen of Indiana, but owned property in Kentucky, of which the slave Agnes, whom he had kept in Louisville, and the land in Shelby, constituted part; that, Moore lived on a farm near Jeffersonville, on the Ohio,nearly opposite to Louisville; that, John Prince had been his overseer, and lived with Catharine Prince, whom he recognized as his, wife and who was reputed to be his wife; that, in the year 1803, the said John Prince abandoned Catharine, and descended the Ohio and Mississippi rivers, declaring that he would never return; that, he never had returned whenthissuit was tried, but had been seen on the Mississippi, in the year 1809; that, in January 1806, Robert K. Moore was married in Louisville, to Catharine Prince, according to all the forms and ceremonies prescribed by the law and usage of Kentucky; that, they cohabited in Indiana as husband and wife, from the time of the marriage until Moore’s death; that, in February, 1807, about two months before his death, his daughter Sarah, was born, of whom he appeared to the fond, and'who was recognized by him and by others, as his child; that the will was not sealed nor attested, but was admitted to record in the proper court of probate in Indiana, on ex parle proof, that the body of the paper and the signature of Moore’s name to it, were both in. his hand writing; and in 1825, on the proper authentication, it was admitted to record in the office of the clerk of this court, without any other or farther proof.
*462 The circuit court decreed to Ewing and wife, the. land in Shelby, and the slave Agnes, and the children which she had borne after Moore’s death.
There was no decree as to any of the estate devised in trust for Mrs. Moore; and, in consequence of an-agreement of the parties, there was no decree for the- - profits or maintenance of the slaves.
Sneed has appealed.
The appellant insists, that the proper parties 'have not been made; that the circuit court had no jurisdiclion; and that the decree is erroneous on the merits. These objections, will be examined in the order iq which they have thus been presented.
I. Although Ewing is styled administrator in the bill, nevertheless, having associated his wife with him, and evidently relying solely on her right, and that which he derived by his marriage, the chancellor should regard the adjunct to his name as descriptio pet'- $ once, and decide the case as if it had not been affixed.
Bullit, Prather and Sneed, were nominated executorsby the will, but none of them ever qualified. Bullitand Pratherhad died prior to the institution of this suit, and consequently; Sneed and Mrs. Moore, on the one side, and Ewing and wife on the other, were proper, and the only proper parties.
II. If any tribunal in Kentucky, had a right to adjudicate on the validity, or effectiveness of the will, as to the property claimed under it in this state, the cir-., cuit court of Jefferson had jurisdiction, Sneed and the •slaves, all being resident in Jefferson county.
But the objection made to the jurisdiction, would apply equally to any and every court in this commonwealth. It is, that the probate in Indiana is conclusive, until it shall have been reversed or revoked by the proper tribunal of that state; and, that therefore, no court in Kentucky has power to decree that there has been an implied revocation of the will.
There is a two fold answer to this objection. 1st. The probate was not conclusive in Indiana. 2nd. If it were, it is not so here.
1st. The probate was not conclusive in Indiana.
Until, since ^ ^gSrt'nau COUnty courts in England, lcsta; . diction.
com" ex varle pro. bate of a tesrights of all “ter.
com_ mon law, an ^f^of ^tés tjme°t be disputed for thirty might be re-01' the tribunal which grant-
com_ mon law, a probate of a will after citation, could "jtbbetj1eJ0^' ®ourj[ wbe¡cb granted it, *1° byTppea”; y unless, ¿Ac Kilt had been proved or had been revoked.
As there is, in this case, no positive proof of what the law on this subject was in Indiana at the date of the probate or since, and as we know judicially what the law of Virginia was, even whilst Indiana was a constituent part of that commonwealth, we must look alone to the common and statute law then in force in Virginia, for maintaining the position now assumed.
Until, since the Norman conquest, county courts in England had testamentary jurisdiction. In the reign ■of H. III. the ecclesiastical courts had, by gradual encroachments, obtained jurisdiction, which not long afterwards, became, with the exception of a few rogative courts, exclusive.
This jurisdiction was, however, confined to testaments of personal estate. I he common mode oi proving a will, was summary and cx parte. But such a probate did not finally conclude the rights of all personsinterested.' It washable to be disputed for thirty years, or to be revoked on citation, by the tribunal which had granted it; Toller,56-76, Ba. ab. title Eexr’s. E. 8. Touchstone, 499. ' A probate in the more formal and effective mode, after a sufficient citation, could not be revoked by the court which granted it, but might be reversed only by appeal, unless the wü{ had been fraudulently proved, or had been revoked', in either of which cases, the original court itself, had power to vacate the probate; Toll. 74-6.
The common law, except so far as it had been mod-^ ified by statute, was in force in Virginia when Indiana was a part of her domain. The only statute of Virginia, within our knowledge, which had materially modified the common law as to testamentary jurisdic•tion, was an act of 1748; Body of Vir. Laws, 167.
That statute,.which vested testamentary jurisdiction in the county courts,both asto the personally and realty, provided, that the probate should not be obligatory as to land, unless the heir or heirs had been cited by actual summons, or if unknown, by proclamation. And though it is silent as to any mode of revoking an ex parte probate as to the personalty, we are bound to consider such a probate, under the act of 1748, as no more effectual -than it was at common law. As the probate of Moore’s will in Indiana was cx parte, without *464 contestation or citation, therefore, presuming, as wé must do, that the law of Virginia as it was since 1748, was the law of Indiana in 1807 as to probates, we ari ive at the conclusion, that., as to the land, the probate of 1807,bad no binding efficacy; and that as to the personally devised, that probate was revocable by the order oi decree of the court which granted it, or of some other court of original jurisdiction; and that, conseqaontly, ii was not in indiana-, even as far as it could tiiwih, conclusive, ‘’until nvirs'd by a revising court” fis far as it <-ouhl 'fply, it could not be tried incidenialiv,nord'tS:xi cl collaterally in Indiana or elsewhere, a, k.,-gas t shall remain unrevoked and unreversed; /'ills, D. Toller, 76. Rut even as to the per■jeti <ily devised, the probate might have been attacked • tad revoked by a direct and original proceeding. Whether this procedure must nave been in the probate court, or might have been in a court of chancery, i t is no; material now to inquire. Even, if the probate should be as effectual here as it was in Indiana, (which is not the case,) it could not affect the land, and if, as we suppose, the slaves and parties gave an incipient juri-diction to the circuitcourt of Jefferson, that jurisdiction cannot, for the reasons which have been suggested, be impaired or clogged by the alleged conclusiveness of the probate. Whether, therefore, the court had jurisdiction, must be ascertained by some other and surer test. This will be found ir. the following considerations on the second branch of the answer ;.o the objection to the jurisdiction.
By the. common Jaw, a prolate of a • wilRifterci- . tulion, might bo vacated by the court winch granted it, i the will was fraudulently proved, or had been revoked. The Virginia , statute of | 1748 which S vested the 1 county courts with testamentary juris die' ion, both as to personalty and rcd-.o, provided ; >t, the pro-hole should ■lot be obliga1 pry as to 'and, unless the heir had been cited by actual summons, or, if unknown, by proclamation.
The Virginia statute of 1748. did not render an ex .parte probate ¡of a will any more effectual, than such .probate was at common '’aw.
2nd. If the probate had been final and conclusive in Indiana, it cannot be so here, as to the land and slaves which were in this state, at the death of the testator.
1st. Maritime courts decide according to the law of nations; and their decisions,or what must be necessarily inferred from them, will be, (so far as they had jurisdiction,) as to the res or subject matter, final and conclusive where ver the law of nations is recognized, and upon all'persons,\vho were interested and had a right to be considered as parties. As the proceedings are strictly ia rem, notice served on the thing is constructive notice to all who have any interest in if, and hence, as the jurisdiction of these courts is exclusive, and they ck *465 cicle on a law of universal obligation, their judgments must be conclusive in the common law -courts, to the extent which has been just intimated, if no farther. Whether the judgments in rcm of all other courts, which decide, not according to the national, but the municipal or local law, should be equally conclusive, we do not now consider material; for, if they be so, the probate in this case is not of that class of judgments. The probate may be considered as a proceeding quasi in ram; but, there is no attachment of the thing or the property devised, and therefore, although all persons interested might have made themselves parties, there was not the same constructive notice as that given in maritime or other ■cases strictly in rcm. And hence, the.probate, without citation or controversy, ought not io be considered as conclusive as an-admiralty decision; and, it may be doubted whether it áhould be more so than an ordinary foreign judgment; see the reasoning of the supreme court in the case of “The Mary.,” (IXCranch, 144.) But, if the probate should even be considered as any other judgment in rcm, it cannot operate conclusively on the property now in contest, because, it was not within the jurisdiction of the court of Indiana. 1 •
Foreign laws, cannot.perse, tra-territorially,
Landis held the law oSf the p!ace -rhereit ^“cannot be held or appropriated tharT aceording to* the will of the local sovereign, or °n 5ÍÍ
Foreign laws cannot,perse operate extra-territorially. Land is held and alienated according to the law of the place where it is situated; and, cannot be held or appropriated otherwise, than according to the will of the local sovereign, or the lea; loci rei sites-, United States vs. Crosby, VII Cranch, 115; Clark et. al. vs. Graham, VI Wheaton, 577; Kerr vs. Moore’s devisees, IX 1b. 566; M’Cormick et. al. vs. Sullivant et. al. X 1b. 192; Vattell B.II, ch. 8. s. 110-114. “As the rights ofanation ought to be respected by all others, none can form any pretensions to the country which belongs to that nation, ner ought to dispose of it, without her consent, any more than of the things contained in the country;” Vat. B. II, c. 7, s. 85. “How could she govern herself at her own pleasure, in the country she inhabits, if she cannot truly and absolutely dispose of it?” Ib. s. 83. “Every state has the liberty of refusing or granting to foreigners the power of possessing lands or. oth»r immoveable property within her territory; and, as the sovereign may refuse to foreigners the privilege of possessing immoveable he is doubtless at liherlv *466 to refuse'granting it, except with certain conditions an* -nexed. Property possessed by aliens, remains subject |0 the jurisdiction and'laws of the-country,” lb. s. 114. The same doctrine, as to immoveable 'property is laid ■down-by Huberus, II vol. B. 1, tit. 3,,p.26; and may be •found in manyother authorities.
At common Jaw, probate dencnas'T.1" n doVisetof land.
A foreign, will,! 'and in Uds63] otate, must, ¡ in order to bo^oxecutod’ Í conformably ¡i to our laws, Foreigu proWio^eonoíu-’ sive evidence, fhat the will taifas toXpas¡ lida in this. state
forriffnS)r<r bateof awill be, in the ^''Tn/uk-1010 loiulusim'tis to the proper-1 ty there, it Huc/e the Cm' rights of the parties as to ¡and in this state, devised by it.
*466 At common law.probate was not-evidence as to a devise of land; Tol 7d; Darby’s lessee vs. Mayer et. al. X Wheat. 465; Carmichael vs. Elmendorf et. al. IV Bibb, 485. we ^ave ready shewn,¡that pro bate under the act of 1748, had no conclusive effect, as to land devised even in Indiana, unless the proper parties had been cited. But if, as (o’land in Indiana, the probate had been as effectual,asa probate here, of.a will devising land here would have been, or as the probate in any other state, where the courts-of probate have jurisdiction over wills devising land, would have been, as to land within the jurisdiction cf the court, the 'foregoing authorities and many-others, which-might be superadded, prove that it cocild not conclude the right to the land dpvised in this state. We would admit that a foreign will, de-V'S'1)S lafid in this slate, nuiy be effectual to pass the ti-'tie; but then it -must be executed -conformably to the flaw of this state. And it is clear, that probate in a for-C‘§R slate, is not conclusive evidence that the will was so executed as to pass land here. Therefore,, the foreign will must be proved, as an original docu-riien{?on any trial involving the title to land in this state, devised, by it, and must, on such proof be decided bj the court here to be valid and effectual, unless, according to the law of this state, there shall have be.en pro-hateofit-by the propercourt here, or what is equivalent to such probate. If such foreign probate should be conclusive, when introduced incidentally, it could n°l 80 when directly attacked as the foundation of a "suit, or of the defence to a suit for the land; IV Bibb and X. Wheaton, supra. There is an essential difference be-^ween ^16 probate and the effect of a will. And the pro.bate in Indiana, being in the nature of a judgment in rem, cannot 'operate conclusively on 'laud which is in [Kentucky. It cannot conclude, more than the jurisdiction in rem, gave the court power to decide. The consequence is, that if the probate had been (as it was not,) conclusive as to the property in Indiana, it could no¡- conciU(je the rights of the parties as to the land io *467 Shelby. As to that land, the will was liable tobe contested whenever offered as evidence of title, unless it bad been recorded in Kentucky according to her laws; and, whenever so recorded, the right to contest it in chancery resulted, ipso facto. So also, though not for all the same reasons, a foreign court had not, according to the common law, the exclusive or controlling power over probates or administrations, as to personal property which was in this state at the death of the testatator or intestate; Toller, 72, 108; III Pr. Wms. 371; Dixon’s exr's. vs. Ramsey’s exr’s. III Cranch, 319; Kerr vs. Morrison’s devisees, IX Wheaton, 565; Armstrong vs. Lair, adm’r. XII Ib. 169; Embry vs. Miller, I Marshall, 303.
conclusive a foreign probate of a will may be, a« to the property in' the country where it is made, yet the will is, as to land in this state devised by it, liable to be contested whenever offered as evidence of title: unless, it bus been recorded in this state according to our laws.
Whenever a foreign wit! is recorded in this state, the right to contest it in chancery, results, ipso facto
According to the common law, a foreign court had not the exclusive or controlling powr over probates or administrations as to personal property which was in this1 state, at the death of the testator or intestate.
Act of 1812, which author», izes non-resident exccators and ad-without ^uai ifyinghere/to maintain suits doesnot°nalee foreign pro™ bates conchi: sm-
*467 As the probate in Indiana did not.(more especially as it was ex parte) conclude the right to the property here at Moore’s death; hence, if in 1807, Indiana had been “a state” in this union, the probate there would not be conclusive here; for, the probate in one state, of a will devising property in another state, is not, as to that property, effectual and conclusive, even in the state in which it was granted; and, of course, it cannot be made, by the federal constitution, more availing in the state in which the property was at the death of the testator.
A statute of 1812, of this state, authorizes non-resident executors or administrators, without qualifying here, to maintain suits in the Kentucky courts. But, this statute was not intended to make foreign probates conclusive; nor, can it be construed to have any other or greater operation on foreign probates or rights to property here resulting from them, than to allow, under specified restrictions, certain suits by fiduciaries, who could not have maintained them on common law principles. It does not apply to devisees; nor to property devised in this state, so as to affect the jurisdiction of our courts of probate; Moore vs. Tanner, VI M. 47. Hence we conclude, that the probate in Indiana, whether she was a state or territory, was inoperative as to the land, and inconclusive as to the slaves.
2nd. The will having been admitted to record in the clerk’s office of this court without probate here, in consequence of an act of 1820, (IIDig. 1247,) tiie jurisdiction of the circuit court is unquestionable, if tiie legislature had constitutional power to enact that stat *468 ,ute.. After authorizing foreign wills to be admitted recorc'in fi‘ie clerk’s office of this court without probaleliere, but solely on a proper authentication of the foreign probate; and, declaring that when so recorded, ^ave fh<3 effect which they would have bacV if they had been proved and recorded in the courts of the counties in which the property devised' was’ ^lenet declares, “andit shali,and may be law- ^ for any person who may be interested in the lands or other-property devised, by his, her, or their bill in equity, tobe filed in the circuit court' having jurisdiction, to contest the validity of such will, in the same manner, and within the same time, that he, she, or they could do, had the said will been proved and admitted to record in the court of the'eounty where the land, or other estate may be at the time of the recording aforesaid.” That the foregoing provision of the, act of 1820, is valid and effectual, we do not doubt. We have seen how necessary it was, according to coibt mon law principles, that there should be probate in a. court of this state, of a foreign will devising property, which was here at the death of the testator.
iProbate of foreign wills was not dispensed with in. this state,.until 1820.
Before 1797,. when a foreign will was offered for probate in a court in this state, any person interested might have contested it, or might have filed a bill in chancery to .try .Us validity. Act of
In 1797, (II Dig. 1-245,) the legislature of this state authorized the ■probate o-f copies of foreign wills. Rut still, their probate in some court of this state was necessary.
Probate, was not dispensed with until' 1820. Thus, by legislative indulgence, the common law has been relaxed in a manner obviously beneficial to those interested in establishing and enforcing foreign wills oí property in this state. Without the act 1797, it would have been necessary to prove the original foreign will in the court of the county in this state, in which jproperty devised by it was, at the death of the testator. Without the act of 1820, probate of an authenticated copy would have been necessary. Now,both are dispensed with. It will not be denied or doubted, that wiien a foreign will had been offered for probate- before 1797, in any court of this state, any person interested might have contested and. resisted it; or, might have filed a bill in chancery to try its validity. It is equally undeniable, that the same right of contestation has existed since 1797. The act of 1820, therefore, confers no new right on those who may be in-tested in defeating' foreign' wills of property in this *469 siate. It only secures to them, beyond any question, the light which they would have had, if the act of 1820 bad never been passed. And if any new right had been granted, was it unconstitutional or unreasonable? If a parly avail himself of the privilege, granted to him by the act of 1829, can he object that a correspondent and reciprocal right is secured by it to his opponent? if he does not choose to avail himself ofthe privilege, let him risk the consequences. Bui, if ne accept the proffered boon, lie must take it cum mere.
in relation td Cor' thf^stato m confers no new fjsbt eigu wilfs, but "¿* them the right of con-the w0,u(] havt; had, though “¿Soe(|i
3rd. But if the acts of 1797, and of 1829, had never passed, and if the will had never been recorded nor offered for probate in Kentucky, we should still be in-dined to sustain the jurisd ction of the circuit court. Both the property in Kentuck}'- and the parties, gave it jurisdiction. The appellees, would not have been bound to forbear suing for the prope?, ty here, until'the appellant should think fit to prove or record the will in this state; nor, would it have been necessary or even proper to have sought, in indiana, a nullification of the will as to the property here. If the will be invalid as to the slaves and land in this state, in consequence of the alleged revocation, the appellees had a right .to sue in this state for the land in Shelby; and, as preparatory to a recovery of it, to demand a decision of the chancellor on the question of implied revocation. They had an equal right to ask ,a similar decision as to the slaves. The lapse of time, and other circumstances, justify the presump tion, tint the slaves have been held by the appellant, as devisee, and not as executor; and, that the estate of Moore has been, long since, fully administered. And therefore, if the will had been revoked as to the slaves, they, like the land, might be decreed at. once to the appellees.
The right to seek a decree as to the validity of the,'| will, is not local;. it is incidental to the property and’l parties in this state. No judgment, decree or order,’! which could have been made by any court in Indiana,^ could have been effectually availing to the appellees vy as to the property in Kentucky; even, if any proceeding for x-evoking the will as to that property, could have | been maintained there. If the appellees had obtained a revocation of the probate, or of the will, by the judgment of any .court in Indiana, that judgment, for flic reasons which have already been suggested, could noi *470 have Con,eluded the rights of the parties to the proPelN 'le''e at Moore’s death. Consequently, the valid)ty and effect of the will, would, as to that, have been fit subjects of controversy in a court of this state. The sentence of revocation by the Indiana court, would have been no more conclusive than the probate itselfwas. It seems to us, therefore, that the law of Kentucky must furnish to the appellees a remedy, if they bo entitled any where to relief; even, if no statute of this state had expressly secured and prescribed a remedy. A suit ,in chancery is prescribed as a proper remedy in such a case. And, if it had not been, it would have been an appropriate remedy; because, the doctrine of implied revocation has been transplanted from the civil law; and, because the property now in contest, having been here at the time of Moore’s death, if the will had never been proved or recorded in any court of this slate, the appellees could have resorted to no remedy, but, a suit in chancery, which would have been, of itself, effectual.
Moreover, an implied pariiil rnvon lion, does not impeach theverity of theprobate-,and, itmay be doubted,whether an implied total revocation, is inconsistent with any thing necessarily concluded by the probate, and more especially an exporte probate. Rut it is not necessary now to discuss or decide this point.
Wherefore, as to the land in Shelby, and the slaves, we are clearly of opinion, that the circuit courtof Jefferson had jurisdiction in chancery; and, was therefore competent to decree that there had been a partial revocation of the will. We need not now decide whether that court could have made any valid and effectual decree in relation to the estate in Indiana.
Nor, does the lapse of time materially affect the case. The disability of one of the appellees would alone save her right, if sne ever had any; and if she never labored under any saving disability, the statute of 1820 would obviate any objection to time. The limitation did not begin to rm until 1825, w,.ten the will was recorded in the clerk’s office of this court.
III. The merits of the case will therefore, be now considered. As we know tiie execution of the will was, as to form, sufficient for passing the land in this state.' *471 •on probate or registration here, conformably to the la-cal law, and as, in the absence of any proof to the contrary, we must presume that it was, according to the lex lod testatoris-, and, therefore, sufficient for passing the slave, even if she must pass according to the law of the domicil. Therefore, the alleged revocation is the only remaining ground of controversy. And here an extensive field, hitherto but partially explored by this court, is presented for examination.
jrapiie[},® vo„ cations of wills are. like trusts' tiont of law ¿h^facts.
There may be an implied revocation either of a particular legacy or of an entire will. Ademption or translation of a legacy, may be an implied revocation, pro tavlo.
A material alteration intho circumstances of a testator may. by implication, revoke a will.
revocations of wills, is, that ?ub* facthas’oecurredmeonth^wilT'an' therefrom, the law prerum®s i? oor" change in the mind or will of the testa-
*471 None of the statutes for regulating the manner of •making and revoking wills, have ever been construed as applicable to implied revocations. These, like re-suiting trusts, are deductions _of law from established tacts.
There may be an implied revocation either of a particular legacy, or of an entire will. '
Ademption or translation of a legacy may be a revocation, pro tanto. ■
“A material alteration in the circumstances” of a testator, may, by implication, revoke a will, either partially or totally, according to the nature of the case.
In all cases of an implied revocation, whether partial or total, theprinciple is the same;it is, thatsince the publication, a fact inconsistent with the legacy or testament, as the case may be, has occurred, and from which, therefore, the law presumes a correspondent •change in the mind and will of the testator, from which, as a legal deduction merely, he is considered as having died intestate, to the extent of such presumed change of purpose.
The doctrine of implied revocation, although the offspring of arbitrary construction, is well defined by settled rules and principles. And therefore, although it is the presumption of a change in the testator’s mind, that induces the implication, that p'esumption is artificial and merely legal; and hence, the fads from which it may arise, are as well defined as the doctrine of revocation itself has been, by the authorities which have established and recognized it. It is not enough til at the testator intended to alter or revoke his will, but some fad must have occurred, from which an alferation of revocation will actually result by intend *472 mentof lazv, and therefore, there maybe such a revocation even contrary to the actual intention of the tcitator-, HI Pr. Wms. 718; 1 oiler-, 21.
The doctrine of implied •vevocations of defined tíed rales anti principios.
vhfóíftheHw will imply a revocation of ^elUt-tincd To'eiibcTii revocation of a will,it is not tho tr«iaioi,t; h tended ’to ■ ;->ior o'-ro V.');. > bil «ill, V -, •■i/icmct t. * ■ r/iv^oc- :• -.r' "I Sma v.hi. i¡ .t icv.>cafi- .,wdl iO:;u!; l>>; i:: hud■ilV -t if Tbo’i >■■■■> bo 1 ¡U, ’"¡•'•a han/ to the :at intenh»ii, of ihn testo: Sub-.equont iU!urid!;o and bivtli of n cliild may revoke a preceded. will. The birth of a child, may alone amount to an implied revocation of a will.
The 3rd see tion of the act of 1797 in relation to vised, is only decl n-atory oi\t,1.e í1'®' /?o£//" anr™‘ pase and issue fire??i)£ indispensable, to pfloot an ^xlion^o'f V°" win>n ° A
*472 A resulting trust can never be established by proof mercly °f iuiention or of contract', but is'a deduction °f law from a simple fact, the payment of the consideration by one person, and conveyance of the legal title vcl|d°” another person; from this fact, without any countervailing fact, a trust will resultto the payor, who will, therefore, be considered as the beneficia^ owner of the land. So, an implied revocation will result only from the fací of ademption or translation, or a determinate alteration in the condition of the tesiator’ as’ f°!' example-, marriage or the birth of an hen'* *nd hence, implied revocation is adoctrine jurix possitivi; and we must, therefore, look to the facts and not lo mere oral declarations of an intention of the tes^alor> ^0'' determining when there 1ms been an implied revocation of his will; I Sanders, '27(5. n. 4.
A subsequent marriage and birth of a child, may revoke a precedent will. On this point all the authorities concur;! Lord Raymond, 441; IV Burrows, 2165; lb. 2182; 1 Pr. Williams, 304; Toller, 18: II Fonblarique. 350; I Washington, 140; Toller, 20; Swinbi 523; 8a. ab. Wills, G.
Some authorities require both marriage and the birth of child; others, admit, either theoneor the other tobesufneient. So far as the statute of this state can operate,- (and it operates in this case on the land a( least,) the birth of a child may alone amount to an implied tovot cation of a prior will; see the 3rd sec. of an act of 1797, (II Dig. 1212.) This statute is, in our opinion, in accord with the, pre-existing law, and is only declaratory of it. Reason and principle, as well as a preponderance of authority, repudiate the notion, that both marriage and issue are indispensable to an implied revocation; see the masterly argument of Fonhlanque in vo’l, 2nd. note, b. This argument of the distinguished annotator, is as conclusive as reason could make it;and although it may be opposed by a numerical majority of decisions and dicta, it is sustained by a decisive preponderance of authority, and by acknowledged principle. We therefore, concur with Fonhlanque, and shall not. *473 .sow discuss a question we consider as settled by such satisfactory authority and luminous reasoning. °
By tho civil *aw> ,a father could not disinherit his ®' ]y. ^ by t°,e common law be “jay . law, thoTirth of a child af4®r fa® 'inte necessarihrimounted toa revocation, mon^aw^the birth óf a child after the dale of the will, is not, reyoonjy^priins13 fade, a revocation boinS during the V may here-yoked by m act or fact in>ui implied revocation of rpbútnjd’by*'' ' The birth of nn ilegitímate child after the rvill. docs not amount to a revocation of
*473 By the civil law, a father could not disinherit hislegitimate child by pretention merely; but by the corn-man law he may. Hence by the civil law. the birth of a posthumouscuild, or of one after the dateof the will, necessorily amounted to a revocation, but the same fact is not, according to the common law, a revocation per sc, but is prim'i facia a-revocation, until the contrary shall be shewn.
A will being ambulatory during the tcstator’slife may be revoked by an actor fad. inconsistent with it. f!ut an implied revocation may be rebuíte I by countervailing facts,so as to shew either that there was no such revocation, or that it was only partial. J 1
.. Mfs. Ewing was bom after the date of her father’s will. Her mother was not mwmte when the will was made. It disposed of the whole estate, and of course made no provision for the child. There is no reason for presuming that the testator would have dbinheritedhis child, if at the date of the will he had expected one; nor is there any fact in (he record which would authorize an inference that he did not intend to change bis will after the birth of his child; on the contrary, the fhets proved, strongly corroborate the presump-'ion of law. Consequently, if Airs. Ewing he legitimate, a strong case of implied revocation is presented. But if she be illegitimate, there cannot have been-any implied revoCation. ’
It is true that the father is under an obligation to maintain his natural, as well as his legitímale -Audit is also true, that by the civil law, a child adoptd as ‘;/t/ms familias" could inherit his patron's estate, And, it is equally true,!hat ‘Moore recognized Mrs. Ewing, and seemed devoted to hoi- as his legitimate and Ollly child.
But, according to the common law, a child horn out of “iuaj/tii wedlock,” is uji/his nullius,” and cannot inherit the father’s estate. The rule, as to implied revoca tions is, as we have stated, fixed and indexible. It does mot allow courts to speculate an! libitum on the moral -duties, the affections, or a •hr-l intentions of íes a tors; fmi, restricts them to an isolated fact, and the counter *474 vailing or corroborating circumstances. Were it otb' erwise, the statute of wills would be virtually abolish-
]jy (bo. common law, a wedlock” its minios, and «loes not inherit his father's estate.
By the com-issue of a mr riage which is voidable, only, is legitímalo,
in this state, the issue in a marriage in' gitímate.
In this case, the essential fact is the birth of the child] and the law requires the birth of a legitimate child. lia hx scripta est. The reason is obvious. If wou]c| b0 inconsistent with the object of implied revocations, to permit a will to be revoked by the birth oí a child, who after the sentence of nullilicalion, would 110* (¡milled to one particle of the e-date of the testat or. Hence, a revocation will be implied by the birth only of a child, who, by operation of law, would ^iave ^üen en‘’-^e<I 1° I*10 esinte> or a portion of it, if there had been no will, and who would take it or some of it, if the will be set aside.
It is, therefore, material to ascertain whether or not Mrs. Ewing be legó ¡mate? According to the common ■law, this question would be answered by determining the character of the union between her parents. They Were aclwtUy married, and according to the forms of law. ]f that marriage were valid or toiclable only^' 'SS,1C necording to the common law, legilimate. But if it were void, and the union therefore, in content pladon of law, merefricious, the common jaw pronoun-cos the child '‘•¡ilia populif and therefore would not allow her to inherit any portion of her father’s'estate^'
But in this respect, the common law has been modi* find by a statute of this slate. By the 19th section of an act of 1790, copied from a Virginia statute of 1785, it is, among o¡hcr things, enacted, that “the issue hi mar,'iage nmaiGR nuet. iy n.vw, shall nevertheless be leoirnivrE.’' /In Kentucky, therefore, Mrs. Ewing is legitimated, although the marriage of her parents may have been “null in law A1 Consequently, so far as the property in contest would have descended, or should-have been disti ibuied according to the law of this state, if Moore had died intestate, Mrs. Ewing would have been his heir, and one of his distributees; and, of course quoad hoc, according to the principles which have been stated, there may have been an implied revocation of the will.
The land being immoveable, would, without doubt, have descended according to the law of this state, and *475 therefore, would have passed to Mrs. Ewing', if her father had died intestate. The necessary consequence-is, that as Mrs. Ewingislegitimateby the law of and as the land would have descended according to ihe lex rei siice, herbirthafterthe date of the will,should operate as an implied revocation of the devise of the land in. Shelby county,in this state.
Wherefore, there being no legal or sufficient opposing fact, it is our opinion, that there has been established' in Mrs. Ewing’s favor, a constructive revocation of the will as to the land, although her -father’s marriage with her mother, may have been “nu'l in law.” There can be no doubt that she must be admitted to be the child of R. K. Moore, and the issue of his marriage with Mrs. Prince. The non-access of Prince to- the mother during her cohabitation With-. Moore, is not only the presumption of law, but the deduction of reason from the facts.
But there can have been no implied revocation of ihe will, as to the slave, unless that, like the land,, would have descended according to the law of Kentucky; or unless Mrs. Ewing was, at her father’s death, deemed legitimate according to the law of Indiana.
The counsel for the appellees have zealously endeavored to maintain each of these propositions, vizi: 1st. That the law of Ketucky, and not that of Indiana, would have regulated the descent or distribution of the slave. 2nd. That Mrs. Ewing was legitimate not only in Kentucky, but in Indiana. We will, proceed to examine the positions thus assumed, in the-order in which they have been stated.
1st. The argument in support of the-first position Is, in substance, that by an international rule, real es-tale passes according to the law of the place where it is situate, and personal estate according to the law of the domicil; that, when Moore died, slaves weredeemr ed real estate in Kentucky, and therefore, the slave devised, would, without any will, have passed according to the law of this state. This conclusion is undenia* ble, if the premises be true. They are-presented in an imposing dress, and the argument is therefore plausible, if not sound. If there be any infirmity in the reasoning, it will be found in the generality of the terms employed; and in their want of accuracy and precision. The premises, as stated, are in our opin *476 ion, not strictly true. .The- following considerations will, we think, tend to shew their fallacy:.
Tío person can possess or even enter upon any portion of: thq soil or territory of a nation, except by the consent of the sovereign power of that nation. Title to land, . is regulated exclusively by the law of the nation, within which it lies. Land passes according to the lev. loci rei situ.
Moveable pro-perty, wherever it may happen to be, is a constituent portion of £ho wealth of the state to which its owncr'belongs.
*476 1st. The tille (o, and disposition of till IMMOVEABLE prope-ty should be; egulated by the sovereign power within whose jurisdiction it is situate. This is. ñoí a concession of comity; bul, it is p necessary law of sovereignty and self-preservation. There is a natural and- necessary connexion between the sovereignty and the soil of a nation or stale. A state which has not th« exclusive dominion over its territory, is more or less dependant and weak; and its “eminent domain’’’ modified by the will oí others, is, lex sub graviore lege.
Hence, as it isindispensahlfe to national independence and self-government, that the sovereign authority, wherever it may he deposited, should have a perfect right of domain,.no-person can possess, or even enter upon any portion of its territory without its consent;, and consequently, the title to land must n-xessitatev be regulated and controlled exclusively by file will or the law of the state, or sovereign within whose borders it is situate. As the soil is the substratum of the body politic, called a sta;e, no nation or state would, be able to preserve its rights, if it would yield to any other power than its own, the right to'dispose of its soil. The reason is therefore obvious, why land pass--es according to the lex loci ni siia. The same reason; applies with almost, if not altogether, an equal force to ail property of an immoveable nature.. As all properly which is necessarily stationary: must be enjoyed, if enjoyed at all, under the protection of the law-s of the place where it is and must remain, it would seem but reasonable and right, that those same laws should alone regulate lis title and disposition.
];ut,the same principle does no: apply to.moveable property, its mobility enables its owner to carry or remove it whither.-oever he may have the right io go. It may t: ereforo be considered as incident to his person, and liable to t: e same regulations of government or lavi'. If ne reside m a foreign state, he may carry the property, there, without, encroaching on the essential rights or power of the state from within whoso limits it was removed. And i: may, vvueiever it may happen tobe, IheiCíme, be console,cd as a constituent portion of the, wealth of tae- state to which its ownej* *477 belongs; Yattel, 165-171. It would seem therefore, that such property ought to be subject to the lex domicilii.
The international rule., which subjects mo*.cubicar personal estate to the lax domicilii, has not generally obtain - ed until modern times.
All maveabk property of t. decedent is distributed according to the lex domi cilii,
As the same necessity did not exist for subjecting moveable or personal estate to the lex domicilii, as that which existed for applying the lex r i sites to real or .immoveable estate, the interna.ional rule as to moveables or personalty had not generally obtained until modern times, when nations had become commercial and comparatively civilized, reasonable and just.
The rule is not universal', because it is not obligatory on a state that withholds its assent to it. The “droit d’aubain” of' France, was not finally repealed until 1819. But the rule as to (lie law of the domicil has •generally obtained, and will apply wherever it has not been interdicted.
It is, therefore,, not a necessary, but a customary law of nations, and is called a. law of comity. But we do not consider it strictly a law of comity. II' it were, tiren it would be perfectly arbitrary; and however unreasonably it might be qualified, this cour. would have to apply it as it is. Bui till reasons which have been barely suggested, and many others which might be urged,tend to shew that it isa just and a reasonable rule, almost the converse of the l-xrñsitce; and that tiierefore,in the absence of any controlling consideration to the contrary, it should be interpreted and applied co-extensively with its reason-arid fitness. And we, therefore, consider it as applicable to all moveable property. This is the doctrine of Yattel; see pages 17á~í75, and Huh. supra. All courts and elementary writers, who have attempted to define the rule, have not employed precisely the same language. Many have used the terms “real” estate, and “personal” estate, whilst others have employed the more appropriate terms, “immovable” and “moveable” estate. Wehavesugges'ed what we consider a sufficient reason for the application of the fra m site to immoveable estale. The same reason would tend forcibly, if not conclusively, to shew that the lex domicilii should be applied to all moveable property. And, u% have not been able to ascertain that, in any one instance, any of those wko-have authoritatively used the terms “real” and“personalf in reference to this question, can be understood as intending by the term “real estate” any thing *478 more or less, than immoveables, or the term “'personal estate?’’ any thing more or less thun moveables.
Huber us, in treating of this principle of public law, says,“tne»e things are not by the immediate force of the foreign law, but the consent of the supreme power in the other government, which gives an effect to foreign laws within its own jurisdiction, in regard to the mutual convenimos of the two nations, which is ihe foundation of all these ruics.” lie is here treating of the law among nations whereby estates pass, and says, that; “movsabks” pass by the law of the domicil; “immoveables” by that of the place where they may be.
Toller in his treatise on executors, says, “the personal property of an intestate, wiiercver situated, must be distributed according to the law of the country where his domicil was, and such is prima facie the place of his residence. Yet, itrnustbe stationary, not an occasional residence; in order that the municipal regulations may attach on the property. If, therefore, an Englishman be settled and die in this country, and administration be taken out (o him here, debts due to him, or other of his pei’sonal effects in Scotland, or abroad, shall be distributed according to the Jaw of England. But if an alien, resident abroad, die inféstate, his whole property here is distributable according to the laws of the country where he so. resides; otherwise no foreigner could deal in our own funds, but at the peril of his effects going according to our laws, and not to those of his own country.”
Vattel says,“since the foreigner still continues to be a citizen of his own country, the property he leaves at his death in a foreign country, ought naturally to devolve on those who are his heirs, according to the laws of the state of which he is a member. But notwithstanding this general rule, his immoveable effects are to be disposed of according to the laws of the country where they are situated.” In speaking, of testaments,, he says, “as to the bequests themselves, we have already observed, that those which relate to immoveables, ought to be conformable to the laws of the country where those immoveables are situated. But as to moveable goods, which he possesses elsewhere, which *479 ■he has with him, or which follow his person, we ought to distinguish between the local laws, whose effect cannot extend beyond the territory, and those laws peculiarly affect the character of a citizen. The foreigner remaining a citizen of his own country, is still bound bj those last mentioned laws wherever he happens to be, and is obliged to conform to them in the disposal of his personal property, and all life moveables whatsoever.” He also says, “the property of an individual does not cease to belong to him on account of his being in a foreign country, it still constitutes a part of the aggregate wealth of his nation."1
It ,g ^ iy real estate* but all im^¡.'tv^wbiol" ' £ governed by the lex rei d-
p„M»alvvcrperty only, but property!^ which isregiib.v.%h ex omicl '-i-
The civilian-, gJ(1<ll¡ntQrop'/ moveable anf immoveable. Lamí and ohattnls real were denominated by the civilians,“¿m-moveable,n while ,/orson nl chattels were ca'lod, by them 'í'mowable',í property
*479 Now, whatever may be the foundation of the rule; whether it be, as .we have supposed and as Vattel thought, Us reasonableness and fitness and a proper-regard to the just rights of individuals and of states; or whether, as Haberus has suggested, it be mutual com 'nience among nations; or whether, according to the idea of Toller, it be the advantage of commercial and social interchange, without fear or risk that the law of the domicil will be frustrated;’ it seems to us, that the same conclusion will result, viz: that moveables will be subject to the lex domicilii. For, the reason of each of the foregoing hypothesis is, in rffed, the same, and applies to whatever may be attachcd to, or accompany the person; and, the reason jntirnated by all, for applying the lex rei silai, is the same, viz: because the tilings to which it applies, are not transportable, or even moveable, and therefore, must be considered as belonging to the sovereign power and resources of the state within whose jurisdiction they are situated. '
When the additional considerations which we suggested, in another part of this opinion he superadded. we feel authorized to conclude, that it is immoveable, and not merely real estate, which is governed by the lex rei sitie-, and that it is moveable, and not technically personal property which is regulated by thclcx domicilii. This doctrine isincidcntally rrcmrnized inthe case of Rankin vs. Lydia; II Marshall, 477.
The classification of property into moveable and .immoveable, is neither arbitrary nor new. It is founded on a natural and necessary distinction, and-wns au *480 thorn ativeiy, and technically established long before the less accurate nomenclature of real and personal ob .ained. The civilians divided property in moveable and immoveable. Land and chattels real, they denominated “immoveable;” ■ and personal chattels, they'called “moveable. The same distinction is recognized by rfac en, sec Ba ab. Exr’s» rí. 1; and by-Ron Manque, Sind. vol. 333; and by Toller, 138; and by Swinburne, 39 j; and by Touchstone, 447; and by Blackstonc, vol. 2nd. 389; as well as by Tattel and Hube.’us, supra.
A devise of “all m >veables” pusses all chatties pers-oial A devise of all “immoveables” passes the land and all chattels real.
The interests of tenants for years and of mortgagees arc chattels real.
Ail moveable property is “personal.” but all immoveable property is 'not “real es~ ■tato.”
A devise Of “all moveables,” passes all chattels persona!, .i devise of all “immoveables,” passes the land, find all chattels real; Touchstone, 417. Chattels perenal* arc properly and si rrctly speaking, things moveable,which may be annexed io, or attendanr on the person of Use owner, * c.2ud. 31a. Com» 391. “dut things personal, by our law, do not only include things movsabut also, someihing mor.:, the whole of which is comprehended under the general name of chattels;” lb. 389.
The interests of tenants for years, and of mortgagees, are formed eha.tols real, “as being in. erests issuing'Out of or annexed to real estates, of whicn taev have one quality, mobility, which denominates them real; hut want the other, viz: a sufficient, legal indeterminate duration; and this want it is, that constitutes them chattels ;'51st. lusts. 15, b.
It seems, therefo -e, that there is an essential, as well as a technical difference betwe n immoveable and real and between moveable and personal estate. All moveable proper,y is “per,- onal;” but all immoveable' properly js not “real estate.” The law of nations, generally characleris-.s proper'y as moveable and immoveable. The common ia,vemploy, the more indefina'.e term-, persono:, ’in/, real <siete-, and hence, as wi* suppose, the common law terms, instead of those cl’ the civil and national lav, have been frequently used _ by common law judges and writers when speaking off the international rule, which we are now considering.
The jus postUmmii of ff-.me did not apply to move. iirs.but applied to ail immoveables. And the jusposlÁ *481 ■hminii of nations, discriminates between “moveables” ■and “immoveables;” Vaitel, B. Ill, c. 11. s. 209.
Law of naííons reiF¡res topass secundumlegemrei * tríbuted se-1" cundum legem „^r(j “0 the name by which oso property may-|'e christianrd code ofThe country in which it lies,
are m < e,:er.'i respect, j descendant! 1 last wills,"port sonalty. j jfdmini?tra^ and may be assests in Üiebts™ °
From the foregoing considerations, we feel authorized to adopt, in reference to the subject now under' consideration, the maxim; "AlM/.iapersonam sequnter, immobitia situm.”
2nd. Were it real and not immoveable estate, which is subject to the lex rd sitm still the estate must be in-musically real, and not so barely in name. .National law should be uniform, and therefore, there could be some fixed principle, whereby its application may be tested. If the international law had used the term, nal estáte” instead of “immoveable estate,” ft would mean such property, and such only, as by common consent, is admitted to be real. It is not the name, but t he thing which must be considered. Were Kentucky to declare that land should be called personal estate, would she thereby subjecthersoil to the dominion of foreignlaw? If Scotland had declared that money should be denominated real estate, would Toller have been mistaken when he said, that money in Scotland owned by a person domiciled in England, would be distributed according to the law of England? Wc think not. The land would still retain all the natural characteristics of realty, and the money would still be intrinsically personal. The one could notbe moved, the otliermightstill follow the person, and swell the pocket of its owner, wherever he might be out of Scotland; and, the law of nations would still hold one to be real, and the other to be. personal. And one would be subject to the law of the place; the other to that of the domicil; notwithstanding, their new and inappropriate names. . One would still be physically and legally moveable, the other immoveable.
3rd. The legislature of Kentucky has never ed that slaves shall be absolutely real estate. Except as to descents and last wills, they are yet, in every _ re-sped, admitted to be personal. They go to the admiuistrator, and may be assets in his hands for pay-meats of debts. The heir cannot maintain a suit for a slave of the intestate, without the assent of the ministralor. Slaves, in this state, are nominally of a twofold character. But the personal character predominates. For every purpose, except those which *482 have been mentioned, they have ever been considered by this court, as much personal, as their nature makes ],n tliC (..u;c 0£ Plumpton vs. Cook, II Marshall, 451, this court ¡,aid, “bat slaves are, in their nature, as muc‘T personal estate as goods and chattels. It is true, that by ¡he po.útive law of this country, slaves are de-dared to be real estate; but by the same law, there arc’ that ru'c’ 80 .exceptions,that they may,at least in common parlance and (o a common intent,he sufficiently described as personal estate.” In Hawkins vs. Craig, VI Monroe, 257, this court says, “slaves, for most purposes arc chattel! s.”
Heir cannot, ■issento/thc administrator, maintain ¿laveofYhc intestate.
The law which, to impártalo1*’’ slaves the/or-t'l'!“jr]u,j!iC and to a greater ox-'■f’
The act of 1.798, which declares that slaves shall be. ■<ub modo, real estate, not only declares that they shall go to the administra or in the first instance, and shall pass by contract as chattel.!, but, provides that there shall be no limitaron in remainder of a slave by deed or will, otherwise, than a remainder of a chattel might be limited. The chief object of the act: of 1798, in declaring slaves to be real estate, was, that, as they are persons, they should not be sold by the administrator, unless a defect of assets -required a sale; but should, like land,'go iotiie devisee, or descend to the family of the deceased owner.
Slaves of the wife, in possession, vest absolutely in the husband. Considering them merely as prope: ty in the abstract, are they personal or real estate? They must surely be admitted to lie personal. They arc persons, and are, tucrcfore, in their nature personal, They are moveable and perishable, and therefore, are in their nature. The law, which imparts to (hem, for a special purpose, and to a qualified ex;cni. me factitious quality of’ realty, still considers them, for Pu‘ Poscs ’and a greater extent, personalty.'
In reference to the question now under consideration, they must, therefore, be taken to be both moveable and personal. This, too, seems to have been the opinion of tnis court, in the 'case of Rankin vs. Lydia, where, the, doctrine of Vatic/, as to moveables and immoveables, is rccogniz. d., and sheas are. classed with movcubles.
4lh. If the legislature of this state, had declared Jliat slavesshould be considered real estate, without qualification, such an act, should not be construed to bean *483 abrogation of the international law, as to the disposition of moveables. Conceding that a state may rightfully refine to admit the application, within its borders, of a public law, adopted by other states for regulating international rights, still, such a selfish policy should not be attributed to any respectable state, without clear proof that it was intended. For analogical reasoning and authority on this point, see Bond. et. al. vs. Jay, VII Cranch, 350; and Van Reimsdyk vs. Kane, et. al. I Galles, 377.
In declaring slaves to be real estate foi certain purpose», the iogisl turo did not intend to prevent thoii di iributiou according to the.lex domicilii.
Slaves, in thi-state, pass according to the lex domicilii
The law of this state, not having even declared that slaves símil be absolutely real estate; and the legislature never having even intimated, that they should not, as other moveables, be subject to the lex domicilii; this court would not be authorized to presume, that, by declaring that, for a certain purpo.-e, they should be considered real estate, the legislature intended to subject them to the l-x rci situs, and thereby take them from the operation of a rule recognized by almost the whole civdized world. Moreover, we can perceive no iho'ive for' such legislation. It is true, that slaves, though property, are persons, and like other persons, may have their local attachments and personal endearments. But such an actas that contemplated, could not, in any degree, prevent the sundering of all these ties. Slaves are, even as property, (4’moventia”) locomotive. They are not affixed to the land like the villeins regardant of England once were. Their owners may export them as merchandize. It could not, therefore, be materia], even io the philanthropist, whether a citizen of Virginia should acqifire title to a slave in Kentucky,bydeedorby parol, or by one law of descent, or another. If he acquired title by a law of primogeniture, the slave wouldbetreated.no worse, nor be in any more dangér of being carried to Virginia or elsewhere, than if the acquisition had been .regulated by any other rule of descent.

Slaves do not escheat, as immoveable'property zvould-, and, therefore, the state has no more interest in them, as property, than it has in horses, or other movcablts; and, consequently, there could be no motive, for excepting them from the operation of the lex domicilii, to which other moveables are subject.

In every aspect, in which we have been able to c onsider the subject, the conclusion must be the same. *484 to-wit: that slaves in this state, pass according to the lex domicilii. We do not consider the Demarara case, decided by an eminent jurist (Kent,) as applicable.
borders, doe's not prevent from owrdn staves in any other country, where slavery A state ornation is interested in the w&uwimer-13 ofWoJypgil vlli^feoever his property or -■ he m¡&Sgoyer The organic law of Indiana, which forbids slavery within her
By a láw of Demarara, slaves were made to pass ‘¡with the land, and were therefore, legally, as immoveiable-ay the land itself. And, consequently, whatever ¡"may have been the reason of the decision, there was sufficient reason for deciding, as was done, that the law of Demarara and not that of the domicil,, should gov crn.
But if there heno law of Indiana, whereby the slave devised'could descend, or be distributed, it mar be conceded that, of necessity, the law of, Kentucky would: have- regulated the disposition of her in the event of Moore’s intestacy.
And here, another obstacle is presented. The counsel for the appellees, insist, that as slavery was not tolerated in Indiana, a slave could not be held or alienated in virtue of any law of Indiana; and that, therefore, Moore’s slaves in Kentucky could have descended, or have been otherwise disposed of, only according to the law of Kentucky.,
We know, that the organic law of Indiana declares that there shall'be no slavery nor involuntary servitude within her borders. But we know, also, that .the interdict is merely social and territorial. It does not operate on an individual citizen of Indiana, as a citizen. It does not disqualify him from holding, as a citizen of "Indiana, slaves,'whenever slavery is permitted, As a state is but an ag.greSah°n °f individuals, the whole body politic is interested in the rights, proprietary as well as personal, of each individual citizen, wheresoever or of whatsoever kind, the property may be, or whithersoever the citizen may go. Indianais interested in the slaves owned by her citizens inKentucky or elsewhere. Their value constitutes, a-, portion of her aggregate wealth. Indiana .herself might, in her own corporate right, own in Kentucky. She would then have an obvious ’"interest in them, and an acknowledged right to dispose ^em according to her own will or law. She has an VjmHly obvious, though not as direct an interest in- slaves in Kentucky, owned by her citizens; and it is her duty citizens and to herself, and is, consequently, her privilege, according to the laws of nations, to defend. *485 that property against aggression or injustice. And as slaves are moveable, and essentially personal estate,. and therefore, pass according to the law of the owner’s domicil, Indiana would have a right to declare, by law, how the slaves of herintostate-eitizens should descend or be distributed. She might rightfully declare that they should descend to any person whom she should think proper to designate as heir. She has no law for regulating the- descent, or distribution of slaves held within her own limits, because none can bo there held; but she has a law prescribing the distribution of personal chattels belonging to her Intestate citizens within her own limits or elsewhere. And it seems to us, that, when the nature and reason of the international rule as to moveables are understood; it should beadmitted, that although slaves cannot be carried to, and domiciled in Indiana, the law of that state, as to the distribution. of personal- chattels, or moveable- property, must regulate- the distribution of slaves in- Kentucky,
Slaves are moveables,nnA and there- ’ f°rp they pars ”¿0 la-wo’/0’ the owner’s domicil.
X i,e carr'-e(j t0 and held in gt‘atc \4ich belong to a citizen of In-distributed * the distributionofpero°n¿*0^¡a£olsf in that state,
To permit moveable pror pevty of a decedent to pass according to the law of the domicil, is promotive of the interests of all civilized and- commercial nations,
It is to be presumed, that every person would desire that the estate which he may leave undisposed.of at his death,. should go to those who are designated as his heirs or distributees by the laws of his own country, or of the country of his domicil, which he had chosen as his country. It is therefore just, to permit this natural wish to be fulfilled, so far as it can he done consistently with the just rights of nations. But to permit 'moveable property to pass according-to the law of the domicil, is not only not incompatible with national justice, bu.t is perfectly consonant with the policy, and obviously promotive of the interests of all civilized and commercial nations. This lex domicilii, encourages social intercourse and commercial interchange among nations; and, therefore, as far as it thus operates, promotes their mutual* welfare. A citizen of the United States would engage reluctantly in commerce or trade with England, if he knew that all the property which he might take there, or acquire there, would,, in the event of his death intestate, whilst it was there, go to those, who, by the law of England, and not of his own country, would be entitled to it.
In addition to these considerations, we must no get that his country has an interest in his estate, therefore, as well as because he is a part of herself, hi *486 an “internal” though imperfect right, to control the disposition of his properly wherever it may be; for -wherever ilshall happen to be, it is still his, and, therefore, should be considered as a constituent part of her resources. Hence, as no “external” right or duty, is inconsistent with this internal right, modern nations, for the purpose of doing justice and encouraging a free. and fearless social and commercial intercourse, have consented, that the lex domicilii shall apply to moveable property within the jurisdiction of a nation or state, where the owner is not domiciled. Now, in the application of this law, it cannot be material by what law the property is held. All property is held in virtue of the law of the place where it is. A citizen in Indiana, owning a horse in Kentucky, would hold it here in consequence of the local Jaw; but still the horse would, on the death of the owner intestate, goto the heir or distributee designated as such by the law of Indiana.
Moveables of an intestate which are in a foreign country, must be distributed according to the law of distributions in force in the country of his domicil, notwithstanding, they be moveables of such a species as are not recognised to be property in the country of the domicil.
Nor can it be material, whether or not the law of the domicil authorizes the proprietor to carry the specific property hence and enjoy it there; for even if it would not, still if should he presumed, that he desired that it should belong to those appointed to be his successors and heirs by the law of his home; and still, also, would the community, of which he was a constituent member, have the same interest in regulating the disposition of it, as if it had been left at the domicil, and recognized there as property. The heir or successor, would be entitled to hold it or its avails, (after paymentof debts) just as the ancestor or predecessor held it. A nd the law of the. domicil should designate that heir or successor. This it can certainly do, although no such property can be held at the domicil. And this the law of Indiana has done, when it declai ed how the moveable property or chattels personal of her intestate citizens should be distributed, or in other words, who should be entitled to. distribution. This law applies to all such property, whether in Indiana or elsewhere, and whether it can be held in Indiana or not. The law of Indiana, interdicting slavery there, does not, in the language of Yattel, as already stated, “affect the character of the citizen.” If it did, Moore would have had no right to the slave in Kentucky a,: *487 long as be was a citizen of Indiana; and, neither the appeliam nor appellees would have any legal claim to her. A contract for a slave in Kentucky, would enforced in Indiana; lluberus, supra. An executed contract in Indiana for a slave in this state, might be valid, and should be construed according to the lex loci contrw/.us. A valid devise of a slave in Kentucky, may, as both parties admit, be made in Indiana; and it seems to us, quite clear, that the law of Indiana must regulate ilw mode, oí devising her. The ejfeit of the devise is another matter.
. It would seem to result, from the foregoing considerations, that there is a law of Indiana, whereby the slaves now in contest, could be distributed in Kentucky.
Suppose that a citizen of the United States, in a commercial adventure abroad, had amassed a largo sum in foreign coin, bank notes, or other commodity, which had been declared contraband by the law of his country, and which, therefore, he could not legally bring with him to the United States, nor circulate or enjoy at home; he-intended, therefore, to exchange, them for other commodities, which he could lawful]} import and enjoy, but died intestate before he made the conversion. Who would be entitled to the property, the persons entitled to distribution by the law of his domicil, or those appointed by the law of the place where he died? The law of the domicil, regulating the distribution of personal chatties, would predominate, although that’ law did not permit such property to be enjoyed at the domicil. Suppose that the goods had been, at his death, where there was no law. bow would they have been distributed?
A citizen of Indiana, owning a sugar plantation in Louisiana, buys slaves in Virginia, intending to emploj them in the cultivation of the sugar cane, or to sell or exchange them. While descending the Ohio river in a boat with the slaves, he dies intestate within the jurisdiction of the state of Ohio. Now, what law would regulate the descent or distribution of these slaves? The law of Virginia certainly could not, nor could that of Louisiana; for, at the death of the owner, the slaves were in neither of these states, nor was the intestate in either of them, or domiciled in either. According to the position assumed by the *488 counsel for the appellees, the law of Ohio could not operate, because slavery is not permitted in Onio; and, if that position be defensible, then the law of Indiana could not apply, and consequently there would be no law for distributing the slaves. If they could be distributed according to the law of Ohio, they could, of course, be distributed according to that of Indiana; and, in that event, should be distributed according to the latter, because it was the law of the domicil. And, • if they should be thus distributed in the case supposed, they go according to the same law in the case now before us. It seems to us undeniable, that, in the supposed case, the law of Indiana would operate. Then 'there must, of course, be a 1/no of Indiana, which can regulate the descent or distribution of slaves in Kentucky; and if there be, and if also, as we have decided, slaves pass according to the -law of the domicil, ’the law of Indiana must control in this "case.
The slaves could not, as such, he taken to Indiana; but their value is there in'contemplation of law, and is not here. They may he carried from this state, and 'converted into money. The money will belong to Indiana. So the land may be sold, and the price may belong to Indiana; but still the land would be here, and belong to Kentucky.
The interests or righfs of Kentucky, cannot be affected by yielding to Indiana, the right, according to the. usage among nations, to regulate the descent or distribution of slaves belonging to her citizens and happening to be here at the time of the owner’s death. The valueofthe slave devised by Moore, was potentially -in Indiana. The slave was his property,by permission of the sovereign power of Indiana, as well as by that of Kentucky. It belonged to the class of moveable estate ■or chattels personal. The-law of Indiana regulating ¡hat general classification of property, applies to all • specific articles of property' within its range, by whatever law it may be held. There is, therefore, a’ law of Indiana, which propn'o vigoro could apply to, and control the right to the slave.
Wherefore, if by 'the law of Indiana, Mrs. Ewing was legitimate, or could have been entitled to the slate in Kentucky; at her fathers death, (had ho died intos *489 tale,) there was an implied revocation of. the will as to the slave, as well as the land; hut otherwise there has been no such revocation.
Although marriage, tike oth«r civil wastber’ tated b/ufe " fe* &>«' con^et> riage which place where it was conj/mmated, is ty legal every'* where else. theTconservator of its own morals¡ and for/’nullify incestuous or contracts0US
But, on this branch of the case, we are met with an argument in limine. The counsel for the appellees in'rist, that as Mrs. Ewing was legitimate in Kentucky, she could not have been illegitimate in Indiana, of •elsewhere. This argument is inconclusive when applied to the facts in this case. As issue is one of the objects and fruits of marriage, and as it is a general rule that the incidents follow 'the law of marriage itself, the argument would have been more formidable, if it had shown that the marriage in this case had been legal. ;■ But, even then, it would have not been conclusive; for, although marriage, like other civil contracts, must be regulated by the lex loci contractus, it is notevcry marriage, which may be valid by the law of the place where it was consummated, that willbe recognized as. legal every where else. Every sovereign state is the conservator>of its own morals, and may nullify ineestuous or polygamous contracts.';,
But the marriage of Mrs. Ewing’s parents was illegal by the law of this state, if :the mother was then the wife of Prince. On the same hypothesis,- it was ille.gal in Indiana. Besides, the marriage was solemnized in Kentucky in the contemplation of being enjoyed in Indiana. And if it had been legal here, thé state of Indiana, where the parties lived, might, for preserving domestic purity, have bastardized the issue, as a penal■ty for a demoralizing cohabitation, if it were such. If such a penalty may be attached to polygamy; it surely may be incurred by polyandrism, or-the having of more than one husband at the same time./
The law of Kentucky, which- declared, that “issue in marriage deemed null in law,” should he legitimate, can be applied only so far as the estate in Kentucky which descends according to her law, may be concerned.
It is a law of inheritance. It does not operate extra territoriam, so as to legitimate, in another state, a child, who, by the law of that state, would be illegitimate there./' This statute of Kentucky would have applied to the land, even if the marriage had taken place in Indiana, But, the issuebeing born in Indiana, *490 must b'e illegithnate, unless the marriage was valid, or unless she was legitimated by the law of Indiana. O » J
mtrria^acts ofWillfam ami ol'Géorgc traot Ümarriageper i>erbn de presentí, mairimoni■ «m.”
Although Inwooont endeavored to convert mar-civil into a religious rite, 1 iwnc'-orreqnirod.ihat it should be in Thccummm law maxim was con'OhiiK non concubitus facitmátrimo'nium.
By thocom.oauonical disability, such as pre-contract, consangumity witlun .logrees^r*1 corporeal inflrmity. reumanlagMoidable onTy B/ the comHiit disability rendered the Bv^lwfiom-’ mtm law, a former mar-solved'by -Jcath or divorce, was ¡i civil disability, and the second marriage, of course, void.
*490 Wedo not know judicially,thattheactof 1785, of Virginia, which has been quoted, was ever in force in Indiana. The north western territory was ceded fey Virginia, to the confederation in 1784. The ordinance 1787» sheds no light on this subject. It only sanctions the laws of Virginia, which had been applied to the ceded territor}’. We know that the common was once ™ ^orce *nIndiana; and, therefore, asno other law has been shown,-we are bound to presume, that the common law in relation to' marriage and Ie~ «¡(¡macy, furnishes the only rule for testing the legitiVa, r> • J macy of Mrs. Ewing.
Before the marriage acts of Williarh, and of George II., a contract of marriage, per verba de present, was considered u ipsum nialrimordum,,” when consummated ^ persons laboring under no legal disability. AI-though Innocent HI. endeavored to convert marriage fronda civil into a religious rite, the common law never recia'ired that it should be “in facie ecclesicz; II Salk, 437. “ Consensus non concubitus facit matrimoniumf was the maxim of the common law.”
, A canonical disability, such as pre-contract, consanguinity within the Levitical degrees, or corporeal in(]Tmity, rendered marriage voidable only; and, until divorce, the marriage was deemed legal, and the issue, of course, legitimate,
... Buta civil disabilityrendered marriagevoid ab initio,, One of these disabilities was a former marriage, undis-s°Led by death ordivorce. In such a case,the second marriage was .not even good de facto; Riddleson vs Morgan, Cro. Eliz, 858; Pride vs. Earls of Bath and Montague, I Salk. 121; Co. Lit. 244; Fenton vs. Reed, IV Johnson’s Reports, 52; Jackson vs. Claw, XVIII 1b. 347.
If, therefore, the mother of Mrs. Ewing was the lawful ■ wife of Prince when she married Moore, that marriage WrtS Vs0 fucto v0>4, and the issue was, of course, illegitimate, as there is no proof of a valid marriage at any time subsequent to that which was celebrated in this s(;ate In 1806, .or of any law of Indiana, legitimating .the .child.
It is a general J rule, that proof of actual marriage if not indisponsible, exco¡ in case* of criminal coir versalion and prosecutions for polygamy. Oil-r
Reputation may be sufficient to prove a former marriage and consequent illegitimacy.
Cohabitation- and reeognionly df mar. riage-
There is no proof of an actual marriage between Ptince and the mother of Mrs, Ewing; but these is abundant proof that they were reputed to be, and recognized each other as husband and wife.
It is a general rule that proof of an actual marriage will not be indispensable, except in cases of aim. con., •a'hd in prosecutions for polygamy. Morris vs. Miller, IV Burrow, 2057.
In England, the spiritual court could not bastardize the issue, after the death of the father or mother; but the reason was, because that court proceeded only pro salute animm.
Wherefore, although a decision that Mrs! Ewing is .illegitimate might reflect discreditably on the memory of the dead, and tend to degrade the living, nevertheless, we are compelled to admit, (whatever consequence may result,) that “reputation” may be sufficient to prove the former marriage, and the consequent illegitimacy.
But proof of reputation merely, should be, in such a case, clear and satisfactory.
Cohabitation and recognition create a presumtion, but nothing more than a presumption, of marriage.
To bastardize the issue of a subsequent marriage of either of the parents, the presumption of prior marriage, subsisting in full force, at the date of the last, should be violent. In the absence of proof, the law presumes in favor of the legality of the marriage between Mrs. Ewing’s parents. It, therefore, requires strong evidence of the alleged prior marriage with Prince, and of the charge that Mrs. Moore was the lawful wife of Pi’ince when she married Moore, in the case cited from II Salk., although there was proof of reputation of a former and subsisting marriage, the court refused to set aside a verdict legitimating the issue of a second marriage. And in the case of Van Buskirk vs. Claw, XVIII Johnson Spencer, Ch. J. says; “Cohabitation and declarations of .the parties, afford strong prima facie evidence of a marriage in fact; but, in the present case, the presumption is encountered by strong facts, producing very great doubts of an actu.al marriage. . Without any apparent rdpture between Van Buskirk and Jane Blaw, they separated, nearly, forty. *492 years ago, without any claims or pretensions upon each other that they were man and wife. It seems to me, a jury would have been authorized to say, that their cohabitation was meretricious.” That case was, however, decidedon another ground, viz: the presumption, from the lapse of time, that Jane- Blaw had died, and that, after her death, Van Busldrk again married the woman whom he had married, within a few months-after his separation from Jane Blaw.
A. jury is as necessary to try the issue revocavit eel non, as it is to try that oCde~ vitaxitvelnon.
*492 In this case, Prince abandoned the mother of Mrs. Ewing, without any known or assigned cause, intending never to return. He never did return. But the law would not presume his death at the date of Moore’s marriage, because then he had been’ absent only about three years; and one witness has sworn that he was. alive in 1809..
The law also presumes- in favor of the legality of the intercourse between Prince and Mrs. Moore, as well as of that between berand R„K. Moore. Whether the one presumption or the other should preponderate, in the absence of all positive evidence, it is not necessary or proper now to decide.
Whether a jury ought to infer, from a careful consideration of all the facts and presumptions, that Prince had been married to Mrs. Moore, and was alive when she married Moore, we shall not here intimate; nor shall we decide on the facts. This is the province of a jury. Whether the marriage of her parents were valid or not, Mrs. Ewing is entitled to the land in Shelby. So far the law will decide, and a jury should find accordingly. But, if the marriage be void, and the issue, therefore, illegitimate, there cannot have been a revocation of the will as to the slave. The validity of the marriage depends on facts. When they shall be ascertained, the law will be as decisive in relation to ihe slave, as it is in relation to the land.
A statute of 1797, requires that a jury shall be em pannelled to try the issue, in a suit contesting the validity of a will. II Dig. 1244, sec. 11.
If Moore’s will be revoked, then, so far as it has been revoked, it is not valid. And if the statute of 1797 gave the chancellor jurisdiction over a case of implied revocation, a jury is indispensable in such a case. *493 because a jury is required in all cases in chancery brought for trying the validity of wills. A jury is as 'necessary to try the issue revocavit vel non, as that of devisavit vel non. m m. Powell- on Dev. 034. Ill Hi &
Mills and Brown,, for appellant; Crittenden, Nicholas and Denny, for appellees».
As the-record doesnot shovvthat the parties dispensed with a-jury by agreement, the decree, without the intervention of a jury, is erroneous.
On this ground, we-must reverse the decree, and remand the case for-trial -by a jury, who, as the law is by this- opinion settled, will- have only to apply the facts, which are left undecided.
Decree reversed, and cause- remanded for further proceedings, according, to this opinion.

■Mr. Nicholas, of counsel for the appellees, presented the following petition for a modification of the above opinion.. .

The counsel for the appellees beg leave to call upon the court for a revision of two points, decided by the opinion delivered in this case.
1st. The application of the lex domicilii of the testator, to govern the transmission of the slave by the wjjh
2nd. The application1 of the law of Indiana, to test the question of Mrs. Ewing’s legitimacy.
The laws of our country cannot, of themselves, have any extra territorial force; and whatever force they are permitted to have in other countries, depends upon the comity of nations; regulated by a sense of their own interests and public convenience; Le Roy vs. Crowninshield, II Mason, 151.
That the estates of deceased persons, domiciled abroad, shall pass according to the lex rei sita, is the general rule every where. That their personal estate shall pass according to the lex domicilii, is an exception merely to the rule.
This exception, of comparatively modern origin, is purely the creature of concession, introduced for the benefit of trade, and existing in every country only to the extent of the particular concession °f that country, *494 It was first judicially established in England, so recently as ^le ^1116 °f Lord Hardwicke. In 1796, we find the English chancellor, in the case of Bempore vs. Johnston, III Vesey, 200, holding this language: “Illthe. point were new and, open, it would he very doubtful whether, in the case of a person dying intestate, having property in different places subject to different laws, the law of each place should not obtain, in the distribution of the property situated there. Many foreign lawyers have held that proposition.’’ If the lex domicilii be the rule throughout Europe, even now, it has become so in many countries within the last thirty years. The droit dlaubainz was first abolished in France, by the constituent assembly, in 1791. It was revived,.® 1808, by the Napoleon code, on the ground that.it/was not universally abolished throughout Europe. It was not finally abolished in France until 1819,.and even then, with, reservations.
Vattel, in some loose reasoning in favor of the adoption into the law of nations of the principle of th elexdomi-cilii as to per sonalty, speaks of personalty, wherever situate, as constituting part of the wealth of the state of which the proprietor' is a citizen. The court not merely adopts this argument, but makes it the true and solé basis of the rule, and permits the law of Indiana tooperate immediately and directly upon the-slave in contest, because at the death of the testator it constituted a portion of the wealth of Indiana. Upon examination, it will ibe found that this is not the true reason or basis of the rule. Huberus, who among the writers on international law, is its most lucid and strenuous advocate, places it on other and better grounds. He says, “ these things are not by the immediate force of the foreign law, but the consent of the supreme power in the other government, which gives an effect to ’ foreign laws within its own jurisdiction, in regard to the mutual con-, venience of the two nations, which is the foundation of all these rules.” The reason of the rule is thus given in the English books: u If an alien dies intestate, his personal property here is distributed according to the laws of the country where he resides; otherwise, no foreigner could deal in our funds, but at the peril of his effects going according to our laws, and not those of his own country;” Toller, 387; I Woodson, 585; Pipon vs. Pipon, Ambler, 27.
*495 As the common law originally stood, even where a foreigner redded in England and died intestate, his Impersonally went to the king. Afterwards, for the encouragement of trade, it was distributed to his next of kin. Again, in more modern times, when a more enlightened policy prevailed, the personalty of a foreigner, situate in England, was permitted to pass according to the law of his domicil; and tais, too, at a time when no such rule obtained in the neighboring countries of Europe. The adoption of the rule into our code could not, therefore, have owed its origin to any idea that the personalty of a foreigner, situate in England, com stituted a part of the wealth of the state to which he belonged,or any inferred right in the foreign law, thence derived, to control the distribution of his property. It was adopted for the sake of the individual foreigner himself, Upon a principle of natural justice, which quadrated with true national policy, and without regard to the existence or nonexistence of similar ones in other countries. So little had the rights of foreign states, as such, to do in the formation of the rule, that where a Frenchman, domiciled in Holland, died intestate, leaving personalty in England, it was distributed according to the law of Holland, and not of France. Even in the case of an Englishman, domiciled in a foreign country, his personalty in England is distributed according to the law of his domicil. See Somerville vs. Somerville, V Vesey, 786.
The rule exists in the same form in every country where it prevails, and if it constitutes a part of the law of nations, it is in that shape. It could not, therefore, have owed its origin, in either the national or municipal bode, to any idea that personalty constituted a part of the totality of “the wealth of that state,” of which the proprietor was a citizen. Suppose an Englishman domiciled in In diana, owning personalty in England, Indiana and Kentucky, and dying intestate, the wnole would be. distributed according to the law of Indiana; and if citizens of that state were his next of kin, it would go to them. Now, if the reason of the rule was, that his personalty constituted a part of the wealth of the state to which he belonged, the whole would be distributed according to the law of England. It is difficult to imagine a principle of comity, as between England and Kentucky, which would require of the latter, as *496 matter of courtesy to the former, to give property belonging to the former, to a citizen of Indiana.
From the evanescent and destructive quality of most personalty, the presumption is well founded upon the ordinary course of human transactions, that the proprietor means to bring it home to his residence at some proximate period. Every man is presumed to die (estate, or intestate, with an eye to the law of his dom■icil. This, together with the great necessity for uniformity in the distribution of the personal estate of deceased persons, the desire of the law to subserve the intentions of the proprietor, and the less degree of imr porinnee and dignity, which it attaches to personalty, when comp .r-;d with real estate, is the true reason why it excepts personalty from its general rules, and’permits it to pats according to the law of its proprietor’s domed, '¿'he taking of the l°x domicilii as the key to the unexpressed will of a deceased proprietor, is in analogy to, and based upon, ihe same reason, as the principle which adopts the lex loci contractus as the true rule of construction.
The principle which adopts the lex domicliiy is so far /rom being juris posiiivi, requiring personalty to be dis-trihuted according to the law of the domicil, or not at all, i hat the lex rñ sMd is only silenced when the other exists, and can he ascertained. In the case of Somerville vs. Somerville, before cited, it is decided, that neither the place of birth, death, or citizenship of the proprietor, has any thing to do with the question; and that neither, nor all of'them together, in the case of two •equal and cotemporary domicils, will have the effect of preponderating the question in favor of the law of either domicil; and that in such case ex necessitate, the lex rei ■sites must prevail. Take the case of an Englishman owning personalty in this country., and executed for treason. Our law would not enforce the English law of forfeiture and give it to the British king. It could not, then, go -according to the law of the domicil, for that would give it to the king and prevent the next of kin from taking. From necessity, our law would come in and distribute it according to its own rules.
If the law of the domicil is adopted, as speaking the intent of ihe owner of moveables, from a presumed inten1 ion on bis pn.rt to bring home his moveables, it is inap; *497 piicable to, and should not be adopted in this Case. No such intention can be presumed of a citizen of Indiana, with'regard to a moveable of this He never could be presumed to intend to bring á slave to Indiana, when by that very act it would cease to be bis property. The testator acquired the slave, in contest, by virtue of the law of Kentucky, held it by that Taw, and would have sold it, had he subjected it to the ■law of his domicil. Must he not, therefore, be presumed 40'have acquired, held and devised the slave with an eye to Kentucky law? The reason for the adoption of the lex domicilii failing here, it ought to be rejected, and our own permitted to>-prevall.
If this be not the true reason of the rule, and it be based entirely upon a principle of comity between nations, the result will be the-same. All that the principle of comity can require, is, to let the foreign law operate where it exists. Where there is no law in the foreign -state applicable to the subject, or it refuses to ¡.pass the property, it would be worse than idle to complain of its not being permitted to operate. Now, the . laws of Indiana are not merely silent, as to the mode of transmitting property in slaves, but even if permitted '■to operate ex propria vigore within our limits, they would refuse to touch it as an unholy thing; or if they did operate at all, it would be to emancipate the slave, which our law certainly would not allow.
The case .of a citizen of Indiana dying there, owning a slave in Kentucky, is the same as that of a man, c.itizen of ik) country, domiciled without-the jurisdiction of any government, dying with personalty here. In ■the latter case our law would direct the descent; because, there was no law of the domicil to do it. In the former, the same reason compels the same result. It -is no answer to say, that though the law of Indiana will ■not pass the property in a slave, yet it furnishes a rule for the distribution of personalty generally. By the law of neither state, is a slave personalty. Not by that of Kentucky, for here it is real estate. Not by that of Indiana, for there it is not property at all, either real •or personal. Will you seek the law of Indiana to direct the succession to a slave, because it is moveable? Neither that law, nor our own, recognizes the term mpveable, as a legal phrase, descriptive óf a class of *498 'property, which uniformly descends, or is distributee! by a given rule. By both laws, what is moveable, sometimes deseends as realty, and what is immoveable frequently passes, and .is distributed as personalty. The opinionof the court is certainly inaccurate in saying, that “ all moveable property is personalty by the common law.” Heir looms, deer in a park, fish in a pond,-bees, rabbits in a warren, and many other things, are well known exceptions to the rule. The broad and only distinction of either code, applicable here, is into realty and personalty. *The one says the subject in dispute is neither; that it-is not property at all. The other says, it is realty. Which shall prevail? The court on got not to go into conjecture as to what the law of Indiana would deem such property to be, if considered there as property upon any supposed analogy to other descriptions of property. Such conjecture would lead to groat uncertainty, and, very probable error. We have as.much right to suppose, that in such case,the Indiana law, would, like that of Virginia and Kentucky, deem a slave real estate, as any-one has to presume the reverse. The plain, the only question is, what is property In .a slave by the Jáw of Indiana as it now is: Realty or personalty? To which that law responds, most’emphatically, neither.
■ We differ entirely from the court, as to the inference deduced, from its supposed case of a citizen of Indiana, dying in the state of Ohio, holding slaves there, in transitu,, for Louisiana. We deem it most certain, that whenever that case does occur, all property in the slaves will be declared to have entirely ceased. The law of comity can require of the Ohio court, when it comes to determine that case, nothing more than that it shall suppose the slaves actually within the limits of Indiana, and permit the Indiana law to operate upon them in the samé manner as if they were actually within its scope and influence. If this be done, the slayes will stand emancipated, and entirely disfranchised from all claim of proprietorship over them.
Acilizen of Indianahasthe same rightof transitfor his slaves through that state, that he has through the stale of Ohio. Now, alter the case supposed, only so far as to place the slaves, in transitu, through Indiana instead of Ohio, at the lime of their proprietoi’s death.. What then *499 Would be the result? There cannot be two opinions about it. The courts of Indiana would most unquestionably declare the negroes free. Yet, at the time their introduction, their master had a proprietorship over them, which could and would have been exercised for a valuable purpose. His bill of sale would have passed the title, and conferred it upon another; when the law is called upon to pass it to his heir or personal representatives, it refuses to do it. Without its intervention, no one can derive the title from the deceased master, and hence, all property in them becomes forever lost.- So, also, had the slaves been in Ohio; and so, also, had they been in Kentucky, but for the law of Kentucky which clamps their birth bonds, and directs how they shall pass to the next of kin of the decedant.
- Suppose the law of Kentucky recognized property an a fox or other animal strictly fires natural, in the proprietor of the land wherever found, and distributed it as personalty; that, a citizen of Indiana died, owning a fox so circumstanced. Now, by the Indiana law, a fox is not recognized as property, and there is no canon which would give it either to the heir or distributee. Would our law permit the proprietorship to be abrogated, and one of its own rules of property to be annulled, merely because the law of the proprietor’s domicil, had no rule governing the case? Or, would the court, operating upon its rules of analogy, endeavor to ascertain what the law of Indiana would do with it, provided it considered-it as property at all, and, for the purpose of giving effect to the lex domicilii,-interpolate, a new rule upon the Indiana code? Ifit adopted the latter alternative, then it would'have to-say, that, in analogy to the case ofdeer, rabbits, &c., the fox, by the law of Indiana, was real estate, and'descended to the heir. Which could not be, for the rule has never been stretched so far, as to permit the Taw of the domicil to direct the descent of real/ estate.
The court says, “iti^-immoveable and not merely real estate-, that follows the law of the place where it is; and-, it is moveable and not merely personal property, that .follows the law of the domicil.” We have been able, after most diligent search, to find no authority whatever for this position, except what is-contained'in.a most *500 literal translation of the latin maxim, mobilia personam.' $t>qu ’nlur, immobilia situm; which, like most maxims,has been framed with a'view more to its pith and brevity^ than its accuracy asa legal definition... It was borrowed from the writers of continental- Europe, in many countries of which it may be strictly correct, where the term mobilia comprises every1 thing that is there deemed personalty. But the very reverse ofitwe deem to be the common law, by which many immoveables,, such as terms for years in land, and the houses built orr them, are deemed personalty, pass to the personal representatives .of a deceased person, and not to his heir,- and are distributed according to the law of his domi-cil. ” As far as we have been able to discover,the common law authorities all lay- down the rule, that it is the personalty of a deceased;, and not his mere moveables, that passes according to the law of his domicil; None of them contain any exception as to immoveables. Whatever, therefore, may be the law on the continent of Europe, in the absence of express authority, we must beg leave to affirm, that the very reverse of the position assumed by the court, is the law in England and’here; and that, according to our law, it is strictly real estate., and not merely immoveable property, that follows the law of the place where it is-;, and that it is personal, and not merely moveable property, which follows the law of the domicil of the owner.
Tlie.28th section of our act ofl798, II Digest, 1155, says, “slaves, in all courts of judicature within this commonwealth, shall be held, taken .and - adjudged to be real estate, and shall descend to the heirs and widows of persons departing this life, as lands are directed to descend,” <&c.-. subject, however, to certain pro^ visions, pone of which, ih the slightest degree, touch this case, or take from .them the quality of real estate here given. By the act of 1800, II Digest, 1247, our legislature has further said, “'that slaves, so far as respects last wills and testaments, shall hereafter, within this commonwealth, be held and deemed as real estate, and shall pass by the last wills of persons possessed thereof, in the same, manner and under the. same regulations as landed property.” No comment on these acta could make plainer or more obvious their undoubted intent, to affix the quality of real estate to slaves. It is true their provisions and subsequent sections- subject- *501 slaves, in'very many particulars, to toe same rules of law which govern personalty, and so general indeed is the enumeration, that it is difficult to^imagine any where the quality of real estate affixed to them so fonnally and emphatically will at all apply, unless it be the very one now under-consideration. In the absence of other sufficient reasons therefor, it is difficult to resist the impression, that the main inducement of the legislature, in clothing slaves with the quality of real estate, was expressly, for the purpose of abstracting them from the operation of foreign laws. It cannot be controverted, that it was very competent for our legislature so to do. But, whatever may have been the reason for making slaves real estate, it cannot be denied that they are so5 and, if the rule laid clown by us be correct, that it is strictly real estate., and not merely immoveable property, which passes according to the lex rei sites, there is an end of the question involved in this case. The slave, in contest, must be adjudged to pass., according to the law of Kentucky, wuich,-as admitted by the decision, would give it to the appellees.. If there be any class of property, more than another, which our legislators are authorized and called upon, by justice, humanity and policy, to keep under the operation our own rules, to the exclusion of all foreign laws, it is that unfortunate part of our population which we hold in bondage;.
Yattel says, “ the validity of a testament, as to its for mv can only be, decided bydhe-judge of the-domicil; buí,| without affecting the validity of the testament itself, the \ bequests contained in it, may be disputed before the; judge of the place where >tiie effects are situated, be- j cause those effects can only be disposed of conformably to the law of the country;” B. II,ch. 7, sec. 85. That-, is, whether a given instrument be the last will of a testato.r, can only be determined by the law of bis ; domicil; but whether a given article of properly, situ- • ate in another country, does or not, pass by the will, must be tested by the law of that other country. For instanée, whether the-instrument in question here, be the last will of M.oore, must be tested by the law of Indiana; but whether Sneed takes the slave, under the devise to him, must be tested by the law of Kentucky. This too, it would seem, without regard to its being realty or personalty. Onr law- says, slaves shall only., *502 , pass,, by wiil, in- the same manner and .under the same-[regulation, as landed property. This,.it was study |competent for ou$ tegislature to declare, without any fin fraction of the comity between nations. All that it can require of us is, to permit foreigners holding property here, to pass it in the same manner, and according to the same regulations* as' is- permitted to our own citizens. When, there fore,-we' find no exception in the-act, as to the case of a foreigner devising a slave in Kentucky, whence does the court derive the authority,, to'interpolate such an exception into the statute? We concede, that in a doubtful case, one at all admitting of two constructions, the court should’ always presume an absence of intention on the part of the legislature, to violate the rules of national law. But here, there is no doubt. The language is so* explicit, general and emphatic, that there is no room for doubt or differing constructions. Neither is there any violation of national law. So far from it, according to Vattel, by putting foreigners upon the same footing in this particular,; T&ith our own citizens, we do what is not merely permitted, but expected, by the international code.
We have dwelt so much at length upon the first pointy to which we proposed to call the atten tion of the court, that we feel constrained greatly to abridge what we had to say on the second; which, in truth, is of equal magnitude in a general point of view, and of major importance, as it regards- this ease. For, if we show Mrs. Ewing to be tlie legitimate1 child’of the testator, she will take the slave, according- to the law of either state, under the opinion delivered by the court.
In applying the law of Indiana, to test the legiti many of Mrs. Ewing, it appears to us, the court has been as unmindful of the rules of national law, as in the application of the lex domicilii, it was over heedful and anxious for their preservation. The lex loci contractus, and not the lex domicilii, is the law which governs the contract of marriage; tests its legality, and determines •all the incidents which accompany or result'from it. Huberus says, “Frizians can contract marriage, in a manner not allowed by the law of Holland. The Frizians, however, without doubt, enjoy among the Hollanders the rights of married people, in the particulars of dower, jointwe, the rights of children to inherit the property of their parents,” &c.; “moreover. *503 the -tights and -incidents of marriage where-celebrated, attend it elsewhere,” &c. Chancellor Kent, in the second volume of his Commentaries, page 78, holds this language: “The principle is, that in respect of marl'iage, the lex loci contractus prevails over the lex domicilii, as being the safer rule, and one dictated by just and enlightened views of international jurisprudence, and is the law and practice of all civilized countries. It is a part of the jus gentium of Europe. Infinite mischief and confusion would ensue, with respect to legitimacy, sucession and other rights, if the rule did not prevail.” In the case- of Medway vs. Needham, XVI Mass. Reports; it was determined, that though the parties had left the state on purpose to evade its statute law, and marry in opposition to it,,and, being married, returned again, yet the marriage was valid. This comity, has been carried so far as to admit the legitimacy of the issue of a person who had been divorced a vinculo for adultery and was declared incompetent to re-marry, and who had gone to a neighboring state and there married, in opposition to the law of his domicil. See Cambridge vs. Lexington, I Pickering; II Kent’s Commentaries, 78. See,also, the case of Clendening vs. Clendening, I Martin, where it was decided, by the supreme court of Louisiana’, that a woman who was deceived into a marriage with a mail representing himself single, and her children had by him, during the life of a former wife, were, in a contest with the children of the first marriage for the father’s property, entitled to all the rights of legitimate wife and children./
From these authorities, we contend that, if this question were trying before an Indiana court, it would determine whether Mrs. Ewing was legitimate by the law of Kentucky and not that of Indiana. Much rather, therefore, will our courts, when the question is tried here, look to our own law for its decision. The court admits her legitimacy under our law, and on that ground has adjudged the land to her. Now, we hold it to be a universal principle, that where a child is legitimate by the law of any one state, it is legitimate in every other state; or, at least, if a child be legitimate by the law of the state in which its parents married, it must be held to be legitmate in every other state, on the apme principle that a marriage, good where contracted. *504 is good every where else¿ She cannot be legitimate in Kentucky and illegitimate in Indiana. She is legitiin both states or neither.
The main reason which has induced the courts to treat foreign marriages as legal, when, made in contravention of ihc home-law, has been for the sake of preserving the legitimacy of the children. Much rather, therefore, ought a foreign-law to be 'respected and adopted, which legitimates the children,-without valida ting the marriage. The innocent offspring would be 4hus protected, whilst the offending parents would be left liable to punishment.
Our modern statutory code has wisely and humanely/ atvdbhed all those harsh and rigid rules ofthe common law. which visited the sins of parents upon their unoffending offspring. In so doing, it seems to us to speak a language almost imperative to our courts, that -'in cases of doubt, they shall lean in favor of legitimacy. ■We ask no more for the success of our cause.
Per curiam. The petition is overruled.